# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68603-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| TJUAN BLYE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: <u>December 9, 2013</u> |

SPEARMAN, A.C.J. — Tjuan Blye appeals his convictions for unlawful

possession of a firearm in the first degree and possession of a stolen firearm. He

argues that the trial court erred in denying his motion to suppress because the

affidavit in support of the warrant did not contain facts sufficient to establish a

nexus between the suspected criminal activity and the residence where the

firearm was found. We conclude that the facts contained in the affidavit were

insufficient to establish such a nexus and reverse.[1]

## FACTS

Tjuan Blye, a suspected drug dealer, was the subject of an Everett police

investigation which spanned several months. On May 26, 2011, Everett Police

---

[1] Blye also contends that insufficient evidence supports his conviction for possession of a stolen firearm because the State failed to establish that he knew the firearm seized was stolen. In a statement of additional grounds pursuant to RAP 10.10, Blye challenges the sufficiency of the evidence regarding his possession of the firearm, asserts that his rights under the confrontation clause were violated, and claims ineffective assistance of counsel. Based on our disposition of this case, we do not address these arguments.

No. 68603-8-I/2

Officer Duane Wantland sought a warrant to arrest Blye and to search Blye's white 2001 Chevrolet Tahoe (the Tahoe) and a residence located at 805 1/2 52nd Place, W. in Everett, WA. for evidence of illegal drug activity and weapons. In support of the request, Wantland submitted an affidavit detailing the Everett Police Department's investigation of Blye since the fall of 2010. The affidavit contained the following information:

- September 29, 2010 – Blye was found in the Tahoe with a small amount of cocaine and with items associated with converting powder cocaine to crack cocaine.

- March 3, 2011 – While driving the Tahoe, Blye was observed engaging in a purported drug deal. A search of the Tahoe revealed a quantity of MDMA (ecstasy). A later search, pursuant to a search warrant, also discovered a quantity of Vicodin, a controlled substance. Blye's cell phone also displayed numerous texts from individuals seeking ecstasy, heroin and marijuana.

- Sometime in April 2011, an informant, at the direction of Wantland, arranged a controlled buy for the purchase of a quantity of crack cocaine from Blye. The purchase was made in the Tahoe.

- May 4, 2011 – The Tahoe, while being driven by an unknown female, was impounded pursuant to a search warrant for marijuana. At the time of the stop, the Tahoe was followed by a blue Honda driven by Blye.

- May 10, 2011 – Blye was observed driving the blue Honda. Blye and an unknown person picked up the Tahoe from impound. The Honda and the Tahoe were driven to 805 ½ 52nd Place W. in Everett, WA. The Tahoe was parked in the driveway of the residence in front of a garage door.

- May 11, 2011 - The Tahoe and the Honda were observed parked at the 805 ½ 52nd Place W. residence. In addition, sometime later that week, the Tahoe was observed parked in the driveway.

2

- May 24, 2011 – The Tahoe was seen by an Everett police officer parked in the driveway at 805 ½ 52nd Place W. The officer also observed a black male fitting Blye's description and a female come and go from the residence, but could not confirm the black male was Blye.

- At some point during the 48 hours preceding the request for the warrant, Wantland arranged for another controlled buy from Blye. After the call was made to arrange the deal, Blye and a female were observed leaving 805 ½ Place W. and getting into the Tahoe. Blye met with the informant and sold him a quantity of crack cocaine. Blye did not return to 805 ½ Place W. after the sale.

The affidavit stated that "Blye has been quite secretive on his residence" and Wantland has been unable to locate Blye at "listed addresses." Clerk's Papers (CP) at 98. The affidavit did not identify Blye or anyone else as a resident of the 805 ½ address or otherwise indicate Blye's relationship to the home or its residents. In addition, the affidavit asserted that:

> Your affiant (Wantland) knows that to produce crack cocaine from cocaine powder, you need a heat source, water and container for cooking the cocaine. Your affiant knows that baking soda and[/]or ammonia is also used in the conversion process. Your affiant knows that normally this process is done indoors in a controlled environment and can be done in a microwave or direct heat source.

CP at 97.

The warrant was issued on May 26, 2011 and was executed that same day by Officer Wantland and other Everett police officers. No one was present at the residence when the officers arrived to execute the warrant, but soon thereafter Blye and a female passenger, later identified as Gabriel Krug, pulled into the driveway in the Tahoe. Blye was placed under arrest. Krug was identified

3

as Blye's girlfriend. It was not alleged that any evidence of illegal drug activity was discovered inside the residence, the Tahoe or on Blye's person. The officers did find evidence that indicated Blye resided at the address. They also found a .40-caliber glock handgun in a drawer of a nightstand. Subsequent police investigation determined that the gun had been stolen approximately three years prior. Blye was charged with unlawful possession of a firearm in the first degree and possession of a stolen firearm.

Pursuant to CrR 3.6, Blye moved to suppress the evidence seized from the residence on the ground that the search violated the fourth amendment to the United States Constitution and article 1, section 7 of the Washington State Constitution. Blye conceded that there was probable cause to search the Tahoe and for his arrest. But he argued the affidavit in support of the warrant did not contain sufficient facts to warrant a reasonable inference that evidence of any criminal activity would be found inside the residence. The trial court denied the motion. A jury found Blye guilty as charged and he was sentenced to 157 months incarceration. He appeals.

## DISCUSSION

The fourth amendment to the United States Constitution and article I, section 7 of our state constitution require that a search warrant issue only on a determination of probable cause. State v. Fry, 168 Wn.2d 1, 5-6, 228 P.3d 1 (2010) (citing State v. Vickers, 148 Wn.2d 91, 108, 59 P.3d 58 (2002)). Probable cause is established where there are facts and circumstances sufficient to establish a reasonable inference that the defendant is involved in criminal activity

4

and that evidence of the criminal activity can be found at the place to be searched. State v. Maddox, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004). It is the probability of involvement in criminal activity or the likelihood of discovering evidence of it in a particular place that governs the existence of probable cause. Id., (citing, State v. Thein, 138 Wn.2d 133, 140, 977 P.2d 582 (1999); ("probable cause requires a nexus between criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched.") (quoting, State v. Goble, 88 Wn. App. 503, 509, 945 P.2d 263 (1997) (citing WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.7(d), at 372 (3d ed.1996)). The judicial officer issuing the warrant is entitled to make reasonable inferences from the facts and circumstances set out in the affidavit. Maddox, 152 Wn.2d at 505 (citing State v. Smith, 16 Wn. App. 425, 427, 558 P.2d 265 (1976)).

On appellate review, we consider the same evidence presented to the judicial officer who issued the warrant. We review *de novo* the issuing judicial officer's conclusion of law that probable cause is established.[2] Ornelas v. United States, 517 U.S. 690, 695, 116 S.Ct 1657, 134 L.Ed.2d 911 (1996); State v. Chamberlin, 161 Wn.2d 30, 40, 162 P.3d 389 (2007); In re Det. of Petersen, 145 Wn.2d 789, 799, 42 P.3d 952 (2002); State v. Estorga, 60 Wn. App. 298, 304

---

[2] The State's reliance on the hearing judge's findings of fact is misplaced. Although CrR 3.6 requires the hearing judge to enter such findings, in the context of appellate review the findings are superfluous because, like the hearing judge, we consider only the record that was before the judicial officer issuing the warrant. Perez, 92 Wn. App. 1, 4 n.3; Estorga, 60 Wn. App. 298, 304 n.3. We also reject the State's argument that we review the issuing judicial officer's legal conclusion that probable cause has been established for abuse of discretion. Although, "[p]rior case law on the standard of appellate review of such probable cause determinations is admittedly muddled," the more recent cases have held *de novo* review is the applicable standard. In re Petersen, 145 Wn.2d, 799.

n.3, 803 P.2d 813 (1991). We interpret the affidavit in a commonsense, practical manner rather than hypertechnically. State v. Perez, 92 Wn. App. 1, 4, 963 P.2d 881 (1998)

Blye concedes that the affidavit submitted in this case is sufficient to support a determination of probable cause to believe evidence of his alleged drug dealing would likely be found in the Tahoe. Crack cocaine and materials used to convert powder cocaine into crack had previously been found in the vehicle and on two occasions he was observed selling crack to a confidential informant while in the Tahoe. The most recent occasion occurred within forty-eight hours of the request for a warrant.

The State does not dispute that all of Blye's criminal activity as related in the affidavit occurred in the Tahoe. Nonetheless, the State argues that the finding of probable cause should extend to the 805 ½ residence. In support of this argument, the State points to the brief sightings of Blye and automobiles associated with him at the residence. In addition, relying on the affiant's assertion that, in his experience, converting powder cocaine into crack requires an indoor environment, the State argues that, because Blye was selling crack, he must have need of an indoor environment to convert powder cocaine into crack. It contends it is reasonable to infer that Blye's indoor environment was the 805 ½ residence and therefore likely that evidence of illegal drug activity would be found there. Of most significance, according to the State, however, is that sometime between May 24 and May 26, after receiving a call from the confidential informant, Blye left the residence in the Tahoe to engage in a drug transaction

with the same informant. From this, the State contends it is reasonable to infer that additional drugs and other evidence would likely be found inside the residence.

The State's arguments are unpersuasive because they hinge on the assumption that Blye had something more than a passing connection to the 805 ½ residence. And, although the search of the residence yielded evidence to suggest that was the case, this evidence was not available to the judicial officer who issued the warrant. According to the affidavit, Blye's only connection to the residence was that two cars associated with Blye had been seen there on four occasions and Blye had been seen there twice over a two-week period.

The State relies principally on Perez, 92 Wn. App. at 7-8. In that case, we upheld a residential search warrant because the affidavit contained both specific information provided to the police by an informant and the officer's direct observations of the suspect, known as Felix. The informant told the police that Felix dealt cocaine in large quantities and that he carried only the amount of cocaine needed for each transaction. The officers set up controlled buys through the informant and observed Felix. On two occasions, they saw him go to the Perez's house and then go to complete drug deals. The officers also documented Felix's use of another address as a safe house. We concluded that these specific facts supported an inference that Perez's house was being used as a "safe house" where Felix kept drugs and other evidence of his drug dealing and upheld the warrant.

Perez is distinguishable. Here, there is no evidence that Blye went to the 805 ½ residence to obtain the drugs he was going to sell to the informant or that Blye's method of operation involved use of the residence as a place to store drugs. The evidence in the affidavit only shows that at the time Blye got the call from the informant, he was already at the residence and he then drove the Tahoe to make the delivery. In the absence of any evidence establishing the nature of Blye's relationship to the residence or its occupants, these facts are insufficient to support an inference that evidence of Blye's criminal activity would be found inside. Were we to hold otherwise, law enforcement officers could establish probable cause to search a residence merely by directing the informant to make the call to arrange a drug deal while the suspect was in the place the officers' wished to search. We cannot sustain the warrant under these circumstances without "diluting important safeguards that assure that the judgment of a disinterested judicial officer will interpose itself between the police and the citizenry." State v. White, 44 Wn. App. 215, 219, 720 P.2d 873 (1986), (quoting Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

The State's reliance on State v. G.M.V., 135 Wn. App. 366, 372, 144 P.3d 358 (2006), is also misplaced. In that case, the defendant's boyfriend stayed at her house several days a week, but he did not live there. A confidential informant working with the police, arranged to buy marijuana from the boyfriend on two occasions. The first time, the boyfriend left G.M.V.'s house to meet the informant and then returned to the house after the sale. The second time, the boyfriend

8

came from a different location but again returned to G.M.V.'s house after the sale. Based on this information, the police obtained a warrant to search G.M.V.'s house and discovered marijuana. G.M.V. was convicted of possession of marijuana. On appeal, she alleged that her lawyer had been ineffective because he did not challenge the warrant. She contended that had he done so, the challenge would have been successful because there was no nexus between her boyfriend's drug dealing and her parent's house. Relying on Thein, she argued that the warrant was based only on generalized notions of the supposed practices of drug dealers. We affirmed her conviction because "the affidavit supporting this warrant did not rely on generalized beliefs about the habits of drug dealers as in Thein. The warrant was to search the place [the boyfriend] left from and returned to before and after he sold drugs. This was a nexus that established probable cause that [the boyfriend] had drugs in the house." G.M.V.,135 Wn. App. at 372.

Significantly, in G.M.V., we focused on the fact that, at least on one occasion, the suspect was seen going directly from the searched residence to a controlled buy and back again. Thus, there was no other place from which he could have obtained the drugs sold other than the house. This evidence, in addition to the fact that the suspect regularly stayed at the house, was sufficient to infer that additional drugs would likely be found inside. By contrast, in this case, there was no evidence in the affidavit that Blye resided at the 805 ½ residence. The affidavit indicated that vehicles associated with Blye were observed at the residence four times, and Blye himself was seen there twice,

9

over a two-week period, but that the location of Blye's residence was unknown. In addition, while the suspect in G.M.V. went directly from the residence to a drug transaction, Blye went from the residence to his Tahoe, a place known to frequently contain crack cocaine, and then to meet the informant. On these facts, it is more likely evidence of illegal drug activity would be found in the Tahoe than in the residence. Thus, G.M.V. is of no help to the State.

This case is more like State v. Goble, 88 Wn. App. 503, 945 P.2d 263 (1997). In that case, a confidential source had informed law enforcement officers that Goble often received illegal drugs sent through the mail to his post office box. In the course of their investigation, the officers learned that Goble and one Loraine Stamper resided at 206 1st Street, in Morton, Washington. They also contacted the United States Postal Inspector, who verified that Stamper was renting P.O. Box 338 at the Morton Post Office. Id. at 504-06.

A few weeks later, the same confidential source told police that Goble had recently received a shipment of controlled substances. An officer asked the mail handling facility at the Seattle-Tacoma Airport to watch for, and notify him of, any packages addressed to P.O. Box 338 in Morton. Shortly afterward, the Seattle-Tacoma mail facility advised that it was in possession of a package addressed to Goble at P.O. Box 338. After a drug dog alerted on the package, police obtained a valid federal search warrant for the package. When the officers executed the warrant, the package was found to contain methamphetamine. Id. at 505-06.

The officers restored the package to its original condition and planned to deliver it to P.O. Box 338 in Morton. They obtained an anticipatory search

warrant, by which they were authorized to follow the package and, only if they observed the package being taken into the 206 1st Street, to search the residence. Officers observed Goble pick up the package from P.O. Box 338 and return to 206 1st Street; they did not see Goble actually enter the residence with the package. Despite this, they executed the search warrant and discovered methamphetamine in the residence. Id. at 506-07.

On appeal, Goble asserted that there was insufficient nexus between the suspected criminal activity and the residence searched. We agreed, reasoning that:

> When the magistrate issued the warrant, he had no information that Goble had previously dealt drugs out of his house, rather than out of a different place (for example, a tavern, his car, or a public park). He had no information that Goble had previously stored drugs at his house, rather than in some other place (for example, in his car, at his place of employment, at a friend's house, or buried in the woods). He had no information that Goble had previously transported drugs from [the post office box] to the house, or that Goble had previously said he intended to do so. In sum, he had no information from which to infer . . . that Goble would take the package from the post office to his house, or that the package would probably be found in the house when the warrant was executed.

Id. at 512.

Similarly, in this case, the affidavit in support of the warrant had no indication that Blye or anyone else had previously dealt drugs from the residence, stored drugs at the residence or transported drugs to the residence from some other location. There was no assertion that drugs were observed going into or coming out of the residence. According to the affidavit, the only

11

evidence was that Blye had sold and transported drugs in the Tahoe. As in Goble, these facts are insufficient to establish a basis to reasonably infer that the residence also contained evidence of Blye's alleged criminal activity.

We conclude the affidavit submitted in support of the warrant lacked a sufficient basis in fact from which to conclude evidence of illegal activity would be found at the residence that was searched. It was error to deny the defendant's motion to suppress.

The judgment is reversed.

Spearman, A.C.J.

WE CONCUR:

Cox, J.